# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

VITALY ZAKOUTO,

    Petitioner,

vs.

LENARD VARE, et al.,

    Respondents.

Case No. 2:06-CV-00133-JCM-(LRL)

**ORDER**

    Before the Court are the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#2), Respondents' Answer (#25), and Petitioner's Reply (#28). The Court finds that Petitioner is not entitled to relief and denies the Petition (#2).

    In the Eighth Judicial District Court of the State of Nevada, Petitioner was convicted of first-degree murder with the use of a deadly weapon, burglary while in possession of a deadly weapon, home invasion while in possession of a deadly weapon, aggravated stalking, and stalking. Petitioner appealed. The Nevada Supreme Court found that the convictions for burglary and home invasion were redundant, and it remanded for vacation of the conviction for home invasion. Otherwise, it affirmed the judgment of conviction. Respondents' Ex. 7, pp. 14-15 (#25-10, pp. 15-16).[1] Petitioner then commenced this action.

    "A federal court may grant a state habeas petitioner relief for a claim that was adjudicated on the merits in state court only if that adjudication 'resulted in a decision that was

---

[1] Page numbers in parentheses refer to the Court's electronic images of the documents.

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" <u>Mitchell v. Esparza</u>, 540 U.S. 12, 15 (2003) (quoting 28 U.S.C. § 2254(d)(1)).

> A state court's decision is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court's decision is not "contrary to . . . clearly established Federal law" simply because the court did not cite our opinions. We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

<u>Id.</u> at 15-16. "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotations omitted).

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

<u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. <u>Davis v. Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2004), <u>cert. dismissed</u>, 545 U.S. 1165 (2005).

In Claim One, Petitioner argues that the introduction of prior testimony from Marina Cannon, the murder victim and his ex-wife, violated the Confrontation Clause of the Sixth Amendment. The prosecution introduced Cannon's testimony from family-court proceedings as evidence supporting the stalking charges.

"Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 68 (2004). On this issue, the Nevada Supreme Court held:

> Because we conclude that Zakouto had the opportunity to confront Cannon in a prior proceeding regarding issues substantially similar to those at the trial below, we reject Zakouto's argument that admission of Cannon's videotape testimony violated his confrontation rights.

Respondents' Ex. 7, p. 5 (#25-10, p. 6). Cannon, being deceased, was unavailable. Her former testimony was cross-examined. The Sixth Amendment requires nothing more. The Nevada Supreme Court reasonably applied Crawford. 28 U.S.C. § 2254(d)(1).

The parties also argue whether the prosecution satisfied Nevada's requirements for admission of former testimony as an exception to the hearsay rule. See Nev. Rev. Stat. § 51.325. This question of state law is not addressable in federal habeas corpus. See Estelle v. McGuire, 502 U.S. 62, 67 (1991).

In Claim Two, Petitioner argues that the trial court should have severed the stalking counts from the murder, burglary, and vacated home invasion counts. Petitioner does not identify any opinion of the Supreme Court of the United States that clearly establishes a constitutional right to severance of counts. Zafiro v. United States, 506 U.S. 534 (1993), from which Petitioner argues, is a federal criminal case that applies Rule 8 of the Federal Rules of Criminal Procedure, which is inapplicable in state criminal cases. In another Rule 8 matter, the Supreme Court of the United States stated:

> Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.

United States v. Lane, 474 U.S. 438, 446 n.8 (1986). To the extent that this statement is a clearly established holding, and not constitutional dictum in a case of criminal procedure, it is a general rule on which the Nevada Supreme Court had leeway. The Nevada Supreme Court held:

> Substantial evidence demonstrated Zakouto's violent despondence over his separation from Cannon, and that he repeatedly threatened her, stalked her and invaded her home. While evidence of collateral offenses is inadmissible to prove that a defendant had a propensity to commit the crime charged, such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent,

> preparation, plan, knowledge, identity, or absence of mistake or accident." We conclude that the stalking evidence established Zakouto's motive and intent for killing Cannon, thus satisfying the test for cross-admissibility between the stalking and the other charges. Also, because the stalking offenses occurred from June 2000 until Cannon's death on December 23, 2000, the acts underlying the stalking charges were not remote in time from those associated with Cannon's murder. We therefore reject Zakouto's claims of prejudice from the joinder.

Respondents' Ex. 7, p. 7 (#25-10, p. 8) (citations omitted). Petitioner presented, and the Nevada Supreme Court analyzed, this as a matter of state-law criminal procedure; the one federal case that the Nevada Supreme Court mentioned, United States v. Brashier, 548 F.2d 1315 (9th Cir. 1976), interpreted the analogous Rule 8 of the Federal Rules of Criminal Procedure, not the Constitution. Nonetheless, the principles that the Nevada Supreme Court used similar to those stated in Lane's footnote 8. Given how general the Lane principle is, the Nevada Supreme Court's decision was a reasonable application of it. 28 U.S.C. § 2254(d)(1).

Claim Three concerns the testimony of Jason Jaeger, one of Cannon's adult sons from another marriage and a chiropractor. Jason testified that Petitioner had a distinctive gait and posture, and that he had observed both many times. Petitioner's Exhibits, p. AA01437 (#11-4, p. 28).[2] Jason watched a security camera videotape of an intruder into Cannon's home at the time of her murder and concluded that the intruder was Petitioner, based upon the intruder's gait and posture. Id., pp. AA01451-53 (#11-4, pp. 12-14). Damon Jaeger, Cannon's other son, also watched the videotape and identified the intruder as Petitioner based upon the intruder's gait and posture. Id., pp. AA01137-40 (#10-3, pp. 2-6). Petitioner argues that it was error for the trial court to treat Jason as a lay witness, and not as an expert witness. Petitioner presented this claim to the Nevada Supreme Court as a matter of state law regarding the admissibility of lay witness testimony. See Nev. Rev. Stat. § 50.265. The Nevada Supreme Court ruled:

> The State presented Jaeger's testimony only as that of a lay witness and, prior to his direct examination, the district court admonished the jury that Jaeger would testify as such. Jaeger testified that he believed the man in the surveillance video was Zakouto because he had seen Zakouto on many occasions and knew his distinctive gait and posture. Jaeger's testimony was based on his own perception and it was helpful to the jury in determining whether Zakouto was the intruder on December 23, 2000. While Jason's chiropractic training may have heightened his abilities of perception,

---

[2] Petitioner did not identify his exhibits by letter or number.

> his identification did not require the skill or knowledge of an expert witness, nor does the identification border upon improper expert testimony. Therefore, we conclude that the district court did not abuse its discretion in denying Zakouto's motion to exclude this testimony.

Respondents' Ex. 7, pp. 8-9 (#25-10, pp. 9-10). Petitioner argues here that the Nevada Supreme Court's ruling was incorrect based upon the analogous Federal Rule of Evidence 701, but the Federal Rules of Evidence do not apply to state-court proceedings and are not rules of constitutional law. The cases that Petitioner cites do not stand for any principles of constitutional law. A state-court ruling on the admissibility of evidence is not addressable in federal habeas corpus unless the admission was so unfair as to amount to a violation of due process. See Estelle v. McGuire, 502 U.S. 62, 67 (1991). Given that Damon, who is not a chiropractor, also identified the intruder as Petitioner by his distinctive gait and posture, Jason's testimony did not cause any unfairness. The Nevada Supreme Court reasonably applied McGuire. 28 U.S.C. § 2254(d)(1).

In Claim Four, Petitioner argues that two separate discussions with police violated the Fifth and Sixth Amendments.

The first discussion occurred on December 23, 2000, and the facts are not in material dispute. The Nevada Supreme Court stated them:

> On December 23, 2000, Cannon was murdered. Police detective David Mesinar suspected Zakouto and requested via dispatch that Zakouto be stopped and detained. Traffic officers[3] eventually located Zakouto, effected a traffic stop, and detained him for questioning by Mesinar. While the officers did not formally place Zakouto under arrest, he was not free to leave. When Detective Mesinar arrived and informed Zakouto of Cannon's murder, Zakouto spontaneously stated that he did not know where she lived. Zakouto then agreed to give a formal statement but, shortly thereafter, terminated the interview so he could consult with his attorney. At that point, the detective told Zakouto he was free to go, but impounded his vehicle. Zakouto became irate and stated he wanted to remove some property from his vehicle. In response to the denial of this request, Zakouto spontaneously informed Mesinar that he saw Cannon at a Wal-Mart on December 22.

Respondents' Ex. 7, p. 2 (#25-10, p. 3). Detective Mesinar did not give Petitioner the warnings set forth in Miranda v. Arizona, 384 U.S. 436.

---

[3]Actually, they were detectives. Petitioner's Exhibits, pp. AA00534-35 (#6-4, pp. 4-5).

The Fifth Amendment issue about this encounter is whether Petitioner was in custody, such that Detective Mesinar needed to give Petitioner the Miranda warnings. "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662 (2004). This test for custody is general, and thus the Nevada Supreme Court had considerable leeway in its application. Id., at 665.

The Nevada Supreme Court identified this governing principle. Respondents' Ex. 7, pp. 9-10 (#25-10, pp. 10-11). It then held:

> When police stopped Zakouto on December 23, 2000, they did not handcuff him, pat him down, or search him for weapons. When the detective arrived, he informed Zakouto that Cannon had been murdered, to which Zakouto responded that he had no knowledge of where Cannon lived. Zakouto agreed to give a formal statement, and followed the detective in a patrol car for a taped interview. Shortly thereafter, Zakouto stated that he would say no more and requested an attorney, upon which the detective terminated the interview. The detective then told Zakouto he was free to leave, but that Mesinar was impounding his car. Only at this point did Zakouto state that he had recently seen Cannon at a Wal-Mart store. Under the totality of the circumstances, we cannot conclude that the district court erred in its determination that Zakouto was not in custody for Miranda purposes when he made incriminating statements after his temporary detention by traffic officers on December 23, 2000. Accordingly, we cannot further conclude that the district court erred in its denial of Zakouto's motion to suppress these pre-arrest statements.

Respondents' Ex. 7, pp. 10-11 (#25-10, pp. 11-12) (footnote omitted). The Nevada Supreme Court considered the various circumstances of the interview, as Alvarado indicates should be done. The Court finds nothing in this decision that was an objectively unreasonable application of Alvarado. 28 U.S.C. § 2254(d)(1).

The next discussion occurred on December 26, 2000, after Detective Mesinar arrested Petitioner for murder. At the evidentiary hearing, Detective Mesinar testified:

> Q    And finally, the last area I want to cover with you is the arrest of Mr. Zakouto on December the 26th. Were you, in fact, the arresting officer?
> A    Yes
> Q    And how did that take place?
> A    It was subsequent to the search warrant at his residence. He was taken into custody at his residence. I was taking him to the Clark County Detention Center.
> Q    Did you have the—well, first of all, when you arrested him, did you advise him of his Miranda rights?
> A    No, I had no intention of talking to him because he had already asked for his attorney at one time.
> Q    During the ride to the jail, did he speak to you?
> A    Yes.
> Q    What did he say?

-6-

```
        A      He asked me what evidence we had against him.  And at that time, I again
        said that his vehicle had been seen in the neighborhood.  I asked him if he had a
        chance to talk with his attorney.  He said he did.  I asked him what his attorney had
        told him and he stated his attorney told him to go ahead and talk to the police.
        And—
        Q      Now—go ahead.
        A      And after that I asked him who drove his vehicle other than himself and he
        said nobody.
        Q      And was that essentially all the questioning that you did of him on the way to
        the jail?
        A      Yes.
```

Petitioner's Exhibits, pp. AA00546-47 (#6-4, pp. 16-17).

The Fifth Amendment issue in this discussion is whether Detective Mesinar interrogated Petitioner, such that Detective Mesinar needed to give Petitioner the <u>Miranda</u> warnings. The Nevada Supreme Court noted and held:

> As noted, <u>Miranda</u> only applies to custodial interrogation.  In the context of <u>Miranda</u>, the Supreme Court has defined "interrogation" as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Further, the Court in <u>Miranda</u> expressly permits the admission of statements that do not stem from custodial police interrogation <u>and</u> which are voluntarily given by the defendant.
>
> Mesinar did not administer <u>Miranda</u> warnings to Zakouto upon making the arrest on December 26, 2000, because he had no intention of conducting an interview at that point.  The circumstances indicate that Zakouto voluntarily and spontaneously made his post-arrest statements, and not in response to any interrogation by Mesinar.  As noted, Detective Mesinar testified that, after he arrested Zakouto, Zakouto informed Mesinar that he had just spoken with his attorney, who advised him to speak with police, after which Zakouto asked the detective what evidence the police had against him.  <u>The detective responded that people had seen Zakouto's car near Cannon's house in the days preceding her death.  It was then that Zakouto responded in turn that no one used his car but him.</u>  The voluntary nature of Zakouto's statements and the fact that the statements did not stem from an interrogation lead us to conclude that the district court properly denied Zakouto's motion to suppress his post-arrest statements.

Respondents' Ex. 7, pp. 11-12 (#25-10, pp. 12-13) (quoting <u>Rhode Island v. Harris</u>, 446 U.S. 291, 301 (1980), and <u>Miranda</u>, 384 U.S. at 478) (emphasis added).  The Nevada Supreme Court missed something.  After Detective Mesinar told Petitioner about his car being seen, he asked Petitioner who else drove Petitioner's car.  Then Petitioner said that he was the only one who drove his car.

Nonetheless, Detective Mesinar did not violate Petitioner's Fifth Amendment rights. Once Petitioner asked to speak with an attorney on December 23, 2000, the police could not

1  question him without first giving him an opportunity to speak with an attorney, unless Petitioner
2  initiated the conversation himself.  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

Id. at 486, n.9.  Petitioner initiated the conversation when he spontaneously asked Detective Mesinar what evidence the police had against him.  According to Detective Mesinar, he asked Petitioner whether Petitioner had the opportunity to speak with his attorney, Petitioner told Detective Mesinar that he had spoken with his attorney, and that his attorney had advised him to speak with the police. In his motion to suppress, Petitioner referred to that question and answer about his attorney, but he did not argue whether Detective Mesinar's statements were accurate.  See Petitioner's Exhibits, pp. AA00112, AA00115-16 (#4-5, pp. 7, 10-11).  In the evidentiary hearing, Petitioner also did not cross-examine Detective Mesinar about the question and answer about Petitioner's attorney.  See Petitioner's Exhibits, pp. AA00548-60 (#6-4, pp. 18-30).  Only after Petitioner said that his attorney advised him to talk with police did Detective Mesinar ask Petitioner who else might have been driving Petitioner's car.  Under the circumstances, Petitioner's answer—that only he drove his car—came after a valid waiver of his right to counsel.

At the time that police were investigating and arresting Petitioner for the murder of Cannon, the state had already charged him with stalking.  Petitioner argues that Detective Mesinar violated the Sixth Amendment by interviewing him outside of the presence of his attorney.  The Sixth Amendment right to counsel is offense-specific.  Texas v. Cobb, 532 U.S. 162, 168 (2001). The right does not attach to factually-related but as-yet-uncharged offenses.  Id.  The right does attach to uncharged crimes that are essentially the same as the charged crimes, as determined by "'whether each provision requires proof of a fact which the other does not.'"  Id. at 172-73 (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)).  On this issue, the Nevada Supreme Court held:

> We find no Sixth Amendment violation. Although stalking charges were pending against Zakouto when he spoke with police on December 23 and later on December 26, the purpose of requesting Zakouto's formal statement on those dates related to the investigation for murder. As of either date, the State had yet to initiate proceedings in connection with that charge.

Respondents' Ex. 7, pp. 12 (#25-10, pp. 13).

Cobb makes clear that the Blockburger test is the start and the end of the analysis. Nevada defines stalking and aggravated stalking as:

> 1. A person who, without lawful authority, willfully or maliciously engages in a course of conduct that would cause a reasonable person to feel terrorized, frightened, intimidated or harassed, and that actually causes the victim to feel terrorized, frightened, intimidated or harassed, commits the crime of stalking. . . .
> 2. A person who commits the crime of stalking and in conjunction therewith threatens the person with the intent to cause him to be placed in reasonable fear of death or substantial bodily harm commits the crime of aggravated stalking.

Nev. Rev. Stat. § 200.575. Nevada defines murder as:

> Murder is the unlawful killing of a human being, with malice aforethought, either express or implied, or caused by a controlled substance which was sold, given, traded or otherwise made available to a person in violation of chapter 453 of NRS. The unlawful killing may be effected by any of the various means by which death may be occasioned.

Nev. Rev. Stat. § 200.010. Finally, Nevada defines burglary as:

> 1. A person who, by day or night, enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, vehicle, vehicle trailer, semitrailer or house trailer, airplane, glider, boat or railroad car, with the intent to commit grand or petit larceny, assault or battery on any person or any felony, or to obtain money or property by false pretenses, is guilty of burglary.

Nev. Rev. Stat. § 200.060. The elements of each crime differ from the elements of the other crimes. Consequently, the Nevada Supreme Court's determination was a reasonable application of Cobb. 28 U.S.C. § 2254(d)(1).

In Claim Five, Petitioner argues that insufficient evidence existed to support the verdicts of guilty for Count I, first-degree murder with the use of a deadly weapon, Count II, burglary while in possession of a deadly weapon, and Count III, home invasion while in possession of a deadly weapon. "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979) (citing In re Winship, 397 U.S. 358 (1970)). On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that

upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16. "[I]t is the exclusive province of the jury, to decide what facts are proved by competent evidence. It was also their province to judge of the credibility of the witnesses, and the weight of their testimony, as tending, in a greater or less degree, to prove the facts relied on." Ewing's Lessee v. Burnet, 36 U.S. (11 Pet.) 41, 50-51 (1837).

Petitioner's argument about the home-invasion count is moot because the Nevada Supreme Court dismissed it. See Respondents' Ex. 7, pp. 14-15 (#25-10, pp. 15-16).

On the remaining counts, the Nevada Supreme Court held:

> First, the State adduced evidence of a lengthy course of violent conduct involving Zakouto, including repeated invasions of Cannon's home by force, acts of vandalism, disruption of her telephone communications, and threats of bodily harm.
>
> Second, Damon and Jason Jaeger credibly identified Zakouto as the disguised intruder on the December 23, 2000, surveillance videotape.
>
> Third, the State introduced compelling evidence of motive. The evidence at trial showed that Zakouto was violently despondent over his breakup with Cannon and threatened to kill both himself and her. Further, the State also introduced evidence that Zakouto was desperate to obtain a motor vehicle insurance settlement and was angry with Cannon for not signing off on the vehicle title so he could recover the insurance proceeds.
>
> Fourth, Cannon was beaten, repeatedly stabbed and shot twice, all of which support the murder charge in this instance.
>
> Fifth, although Cannon attempted to move without revealing her new residence to Zakouto, several neighbors observed Zakouto's vehicle in her new neighborhood days before the murder. Their observations, when linked with Zakouto's statement to Detective Mesinar that he was the only person who drove his vehicle, provided corroborative proof of a pre-conceived plan to kill his wife.

Petitioner argues that the only evidence is a videotape showing an intruder to Cannon's residence, and that the identification of Petitioner from that videotape was improper. The Court has already rejected the improper-testimony claim about Jason Jaeger. Furthermore, Damon Jaeger also identified Petitioner based upon the posture and gait of the intruder, and Petitioner does not challenge the validity of that identification. Petitioner also argues that testimony was conflicting over whether he and his car were in Cannon's neighborhood before the murder. However,

resolution of such conflicts is the jury's decision to make, and the jury decided against Petitioner. Petitioner does not argue about the other evidence that the Nevada Supreme Court considered: Petitioner's prior acts of violence against Cannon, the motive to commit murder, and the nature of Cannon's mortal wounds. Under these circumstances, the Nevada Supreme Court reasonably applied Jackson. 28 U.S.C. § 2254(d)(1).

In Claim Six, Petitioner argues that cumulative error entitles him to relief.

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers [v. Mississippi], 410 U.S. [284,] 298, 302-03 [(1973)] (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial").

Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007). On this issue, the Nevada Supreme Court held:

> Zakouto argues that the cumulative prejudice of the errors at trial warrants a new trial. The only error we ascertain is that involving the redundant convictions, which we find insufficient to overturn any portion of the judgment of conviction entered upon the remaining jury verdicts.

The cumulative-error standard is a general rule, and the Nevada Supreme Court has wide judgment in applying it. See Alvarado, 541 U.S. at 664. The Nevada Supreme Court found one error—a redundant conviction for home invasion—and corrected that error. Consequently, its rejection of the cumulative-error claim was a reasonable application of Chambers. 28 U.S.C. § 2254(d)(1).

IT IS THEREFORE ORDERED that the Petition for a Writ of Habeas Corpus (#2) is **DENIED**. The Clerk of the Court shall enter judgment accordingly.

DATED this 15th day of January, 2008.

_____
JAMES C. MAHAN
United States District Judge